UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| EARL JAMES WARNER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO. 1:11-CV-00267 |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Plaintiff Earl Warner appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for Supplemental Security Income ("SSI").[1] (*See* Docket # 1.) For the following reasons, the Commissioner's decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

Warner applied for SSI in May 2008, alleging that he became disabled as of June 1, 2005. (Tr. 86-92.)  The Commissioner denied his application initially and upon reconsideration, and Warner requested an administrative hearing. (Tr. 46-55.)  On April 15, 2010, Administrative Law Judge ("ALJ") John Pope conducted a video hearing at which Warner, who appeared *pro se*, and a vocational expert ("VE") testified. (Tr. 26-45.)

On July 22, 2010, the ALJ rendered an unfavorable decision to Warner, concluding that he was not disabled despite the limitations caused by his impairments because he could perform

---

[1] All parties have consented to the Magistrate Judge. (Docket # 15); *see* 28 U.S.C. § 636(c).

his past relevant work as a janitor. (Tr. 10-19.)  The Appeals Council denied Warner's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-6.)

Warner filed a complaint with this Court on August 5, 2011, seeking relief from the Commissioner's final decision. (Docket # 1.)  In this appeal, he alleges that the ALJ (1) improperly evaluated his mental residual functional capacity, (2) incorrectly determined at step four that he could return to his past work as a janitor, and (3) should not have discounted the credibility of his symptom testimony. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 7-10.)

## II.  FACTUAL BACKGROUND[2]

### A.  Background

At the time of the ALJ's decision, Warner was fifty-two years old, had a high school education, and possessed past relevant work experience as a janitor and factory laborer. (Tr. 31, 86, 119.)  He asserted in his SSI application that he was disabled due to a "swollen right leg" (Tr. 118), but later added a learning disorder, borderline intellectual functioning, major depressive disorder, and obesity as additional reasons for his claim (Opening Br. 2).  Because Warner does not challenge the ALJ's consideration of his physical impairments, the Court will focus on the evidence pertaining to his mental limitations.

### B.  Warner's Testimony at the Hearing

At the hearing, Warner testified that he lives with his girlfriend in a mobile home. (Tr. 30-31.)  He is independent in his self care, does his own grocery shopping, and drives a car. (Tr. 37, 41.)  On a typical day, he does housework for several hours, including meal preparation,

---

[2] In the interest of brevity, this opinion recounts only the portions of the 236-page administrative record necessary to the decision.

vacuuming, laundry, and washing dishes; takes a two-hour walk; performs three hours of yard work; and watches television for the remainder of the day. (Tr. 35-37.)  He enjoys fishing and playing cards in his spare time and sees family or friends almost every day. (Tr. 38-39.)

Warner stated that he worked as a janitor until 2004, but then was terminated because he could not stand on his right leg; he has not looked for other work since his 2004 termination. (Tr. 32.)  He elaborated that his right leg swells when he stands or walks, but that he has no trouble with sitting. (Tr. 33, 40-41.)  He had not seen a doctor or taken medication for his leg condition in over a year. (Tr. 33-35.)  He estimated that he could lift fifty pounds, walk for four hours in an eight-hour workday, stand for five hours with breaks, and perform unlimited sitting. (Tr. 41.)

Warner further testified that he was currently taking Zyprexa and Lexapro "for [his] bipolar" and that these medications were helpful to him and caused no side effects. (Tr. 35.)  He testified that the bipolar disorder affects his concentration, but when asked to provide a specific example of a time when his concentration was a problem, he could not do so and simply stated that he "get[s] confused sometimes." (Tr. 38, 40.)  He attended counseling once a month for about nine months prior to his application date, but stopped going in mid-2008 because "[t]hey said . . . [he] didn't need their services anymore." (Tr. 39.)  He also stated that he gets along with people "real well." (Tr. 40.)

### C.  Summary of the Medical Evidence

In June 2007, Warner was hospitalized due to feeling depressed and suicidal over his inability to find a job, his past criminal history, and his anger at a friend. (Tr. 217-18.)  He reported that he had been hospitalized for depression on two previous occasions, one six years earlier and the other thirty years earlier. (Tr. 217-18.)  On mental status exam, he appeared

disheveled, reporting poor sleep and that he heard voices the night before his admission. (Tr. 218.)  He told the nurse that he wanted to obtain disability benefits. (Tr. 218.)  He was diagnosed with major depression, recurrent type with psychotic features, and rule out personality disorder; he was assigned a Global Assessment of Functioning ("GAF") score of 30 to 35.[3] (Tr. 218.)

From July 2007 to September 2008, Warner was seen at the Northeastern Center on a monthly basis for medication management and counseling. (Tr. 206-13.)  In October 2007, he reported that he was "great" and that his sleep was "good." (Tr. 216.)  In November 2007, he continued to report that he was doing well overall. (Tr. 209.)  In December, he stated that he was doing fine and that his mood was stable. (Tr. 215.)  In April 2008, he told his counselor that he was doing "great" and that he "wakes up happy." (Tr. 208.)  He did admit to hearing voices two months earlier, but stated that he had been under a great deal of stress. (Tr. 208.)  He reported no side effects from his medications. (Tr. 207.)  In June 2008, Warner and his counselor agreed that he would see his counselor only as-needed, but that he would continue services for medication management. (Tr. 207.)  In September 2008, a termination summary reflected a diagnosis of major depression, recurrent with psychotic features, and a GAF of 50/45. (Tr. 206.)  It was noted that he had met his goals, had remained stable, and would get medications through St. Martin's Healthcare. (Tr. 206.)

---

[3] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 21-30 reflects behavior that is considerably influenced by delusions or hallucinations, a serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation), or an inability to function in almost all areas (e.g., stays in bed all day; has no job, home, or friends). *Id*. A GAF score of 31 to 40 reflects some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., avoids friends, neglects family, and is unable to work).  A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id*

From August 2007 to October 2008, Warner received medication refills of Zyprexa, Zydis, and Lexapro through St. Martin's. (Tr. 223-24.) He generally reported to St. Martin's that he was doing well. (Tr. 223-24.)

On October 2, 2007, Warner underwent a psychological evaluation by Wayne Von Bargen, Ph.D., at the request of the state agency. (Tr. 193-94.) A WAIS-3 showed a verbal IQ of 63, a performance IQ of 77, and a full-scale IQ of 66. (Tr. 194.) He was appropriately persistent during the evaluation and appeared to easily understand the instructions. (Tr. 193.) The results suggested that Warner should be able to perform and learn cognitive and intellectual tasks at a level substantially below that of others the same age, and when learning new academic and other skills, he probably learns information presented visually with less difficulty than when presented verbally. (Tr. 194.) He was assigned a diagnosis of learning disorder NOS and borderline intellectual functioning. (Tr. 194.)

On September 6, 2008, Warner was examined by Dr. Haihong Mao. (Tr. 201-03.) Upon physical examination, Dr. Mao appreciated no limitation in sitting, squatting, movement, or walking; Warner also exhibited normal strength. (Tr. 203.) Warner was able to follow simple directions, and his mood and affect were appropriate. (Tr. 203.) Although Warner claimed to have difficulty walking long distance due to right leg pain, Dr. Mao opined that his physical examination findings did not support that. (Tr. 203.)

Also in September 2008, Dr. A Dobson, a state agency physician, reviewed Warner's record and concluded that he did not have a severe physical impairment. (Tr. 204.) His opinion was later affirmed by a second state agency physician. (Tr. 228.) On November 1, 2008, Warner failed to show for a consultative examination scheduled by the state agency. (Tr. 18, 231.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see* 42 U.S.C. § 1383(c)(3).  The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.*  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Id.*  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Id.*

### IV.  ANALYSIS

#### A.  *The Law*

Under the Act, a plaintiff is entitled to SSI if he "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological

abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D).

In determining whether Warner is disabled as defined by the Act, the ALJ conducted the familiar five-step analytical process, which required him to consider the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[4] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Id.* at 885-86.

### B. *The ALJ's Decision*

On July 22, 2010, the ALJ rendered his opinion. (Tr. 10-19.) He found at step one of the five-step analysis that Warner had not engaged in substantial gainful activity since his application date, and at step two, that Warner's learning disorder and borderline intellectual functioning were severe impairments. (Tr. 12.) At step three, he determined that Warner's impairment or combination of impairments did not meet or equal a listing. (Tr. 13.) Before

---

[4] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 416.920(e), 416.945. The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 416.920(e), 416.945(a)(5).

proceeding to step four, the ALJ found Warner's subjective complaints not credible to the extent they were inconsistent with an RFC for medium, unskilled work. (Tr. 15, 17.)  Then, at step four, the ALJ found that Warner was capable of performing his past relevant work in janitorial services. (Tr. 18.)  Consequently, Warner's claim for SSI was denied. (Tr. 18-19.)

### C. The RFC Assigned by the ALJ Is Supported by Substantial Evidence

Warner first argues that the ALJ erred when assigning an RFC for "unskilled work," contending that it fails to account for the ALJ's finding that he had moderate difficulties in concentration, persistence, or pace and ignores the GAF score of 50/45 assigned by the Northeastern Center in September 2008.  On this record, however, Warner's argument does not warrant a remand of the Commissioner's final decision.

In determining the severity of a claimant's mental impairments at step two of the five-step analysis, the ALJ addresses the claimant's degree of functional limitation in four "broad functional areas": activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 416.920a(a)(c)(3); *see Jones v. Massanari*, No. 01-C-0024-C, 2001 WL 34382025, at *13 (W.D. Wis. Oct. 18, 2001).  The Seventh Circuit Court of Appeals has stated that the ALJ must then "incorporate" these limitations into the hypothetical questions posed to the VE. *Kasarsky v. Barnhart*, 335 F.3d 539, 543-44 (7th Cir. 2003) (holding that the ALJ erred when neither his RFC nor his hypothetical question to the VE "t[ook] into account" his finding at step two that the claimant had deficiencies in concentration, persistence, and pace); *see also O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010).  Stated more broadly, "to the extent the ALJ relies on testimony from a vocational expert, the question posed to the expert must incorporate *all* relevant limitations from which the claimant

suffers." *Kasarsky*, 335 F.3d at 543 (emphasis added).

Here, at step three, the ALJ found that Warner had moderate difficulties in maintaining concentration, persistence, or pace because of his learning disorder and borderline intellectual functioning, but no difficulties in social functioning or activities of daily living. (Tr. 15.)  The ALJ then concluded that Warner's mental difficulties would be "best addressed by a limitation to unskilled work," and thus assigned Warner that limitation in the RFC and when questioning the VE. (Tr. 15.)

Warner argues, however, that a limitation to "unskilled work" does not adequately account for moderate deficits in the ability to maintain concentration, persistence, or pace because "the ability to stay with a given task over a sustained period of time is not the same as the ability to learn how to do tasks of a given complexity." (Opening Br. 9.)  Indeed, some courts have stated that "[o]nly if a doctor used the descriptive language to describe what work a claimant can perform in spite of [his] limitations can the ALJ use those terms in the RFC or hypothetical questions the VE." *Coots v. Astrue*, No. 08-cv-2197, 2009 WL 3097433, at *8 (C.D. Ill. Sept. 22, 2009) (citing *Johansen v. Barnhart*, 314 F.3d 283, 289 (7th Cir. 2002)); *see also Conley v. Astrue*, 692 F. Supp. 2d 1004, 1008-09 (C.D. Ill. 2010).  And, the Seventh Circuit has found a hypothetical flawed where it "purported to tell the vocational expert what types of work [the claimant] could perform rather than setting forth [the claimant's] limitations and allowing the expert to conclude on his own what types of work [the claimant] could perform." *Young v. Barnhart*, 362 F.3d 995, 1004 n.4 (7th Cir. 2004); *see also Stewart v. Astrue*, 561 F.3d 679, 684-85 (7th Cir. 2009); *Everroad v. Astrue*, No. 4:06-cv-100, 2007 WL 2363375, at *8 (S.D. Ind. Aug. 10, 2007).

9

But in this particular instance, the ALJ's RFC for "unskilled work" is amply supported by the record. "Unskilled work" is defined in the regulations as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 416.968(a); *see Jelinek v. Astrue*, 662 F.3d 805, 813-14 (7th Cir. 2011). The Social Security Administration ("SSA") further articulated that the following mental activities are generally required to perform unskilled work: understanding, remembering, and carrying out simple instructions; making judgments that are commensurate with the functions of unskilled work (i.e., simple work-related decisions); responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting. SSR 96-9p, 1996 WL 374186, at *9.

In limiting Warner to "unskilled work," the ALJ reasonably relied upon the longitudinal treatment record, the consulting opinion of Dr. Von Bargen, and Warner's activities of daily living and past work history. (Tr. 17-18.) To begin, the ALJ aptly summarized that after Warner's SSI application date in May 2008, the medical records reflect *no* specific problems associated with his mental functioning. (Tr. 14); *see Smith v. Apfel*, 231 F.3d 433, 439 (7th Cir. 2000) ("[A]n ALJ may consider the lack of medical evidence as probative of the claimant's credibility."); 20 C.F.R. § 404.1529(c)(2); SSR 96-7p; *see generally Ellis v. Astrue*, No. 08-cv-1021, 2010 WL 695654, at *5 (E.D. Wis. Feb. 23, 2010) (explaining that with the SSI program, a claimant is not eligible to receive benefits until the month *after* his application is filed).

More specifically, the ALJ emphasized that although Warner saw a psychiatrist and counselor at the Northeastern Center on a monthly basis for about nine months in 2007 and 2008, he stopped going in mid-2008 because they told him he no longer needed their services. (Tr. 14.)

The ALJ also considered that while Warner continues to benefit from medication, he reports no problems with anger, depression, or racing thoughts, and the record does not even reflect a diagnosis of bipolar disorder. (Tr. 14.) Furthermore, the ALJ considered that Dr. Von Bargen, the consulting psychologist, opined that Warner appeared to understand instructions readily and displayed an overall appropriate attitude, good motivation, and appropriate persistence. (Tr. 17.)

Accordingly, the ALJ observed, and appropriately so, that Warner has not produced any medical source opinion indicating that he lacks the mental activities necessary to perform unskilled work. *See Craft v. Astrue*, 539 F.3d 668, 677 (7th Cir. 2008) ("[W]here the claimant has the ability to understand, carry out, and remember simple instructions; respond appropriately to supervision, coworkers, and usual work situations; and deal with changes in a routine work setting, then an RFC of 'unskilled' work would be appropriate."). Of course, "[i]t is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability." *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (citing 20 C.F.R. § 416.912(c) ("You must provide medical evidence showing that you have an impairment and how severe it is during the time you say that you were disabled.")).

Warner contends, however, that the GAF score of 50/45 assigned by the Northeastern Center in September 2008 *is* evidence that he is mentally incapable of performing even unskilled work. (Opening Br. 8-9.) But "GAF scores are intended to be used to make treatment decisions, . . . not as a measure of the extent of an individual's disability." *Martinez v. Astrue*, No. 9 C 3051, 2010 WL 1292491, at *9 (N.D. Ill. Mar. 29, 2010) (internal quotation marks and citation omitted); *see Curry v. Astrue*, No. 3:09-cv-565, 2010 WL 4537868, at *7 (N.D. Ind. Nov. 2, 2010) ("GAF scores are more probative for assessing treatment options rather than determining

11

functional capacity and a person's disability."). "[N]owhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on [his] GAF score." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (citation and internal quotation marks omitted); *accord Adams v. Astrue*, No. 1:06-cv-393, 2009 WL 1404675, at *4 (N.D. Ind. May 18, 2009). And in this instance, the GAF was assigned by a social worker and family therapist, rather than an "acceptable medical source," *see* 20 C.F.R. § 416.913, and the score is blatantly inconsistent with their narrative report that Warner was "generally pleased with his life and doing well."[5] (Tr. 206); *see Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995) (instructing that an ALJ may discount medical evidence if it is internally inconsistent or inconsistent with other evidence).

Moreover, in addition to the medical evidence, the ALJ considered that Warner's activities reflected a fairly typical, varied day, which included preparing meals, watching television, going grocery shopping, taking two-hour walks, playing cards, and performing several hours of housework and yard work. (Tr. 14-15.) The ALJ observed that although Warner complained of getting confused at times, he indicated that he does really well with playing cards, especially a "500 rummy" game; has no difficulties spending time with friends and family every

---

[5] Because the ALJ discussed the narrative findings contained in Northeastern Center's records (Tr. 14, 16-17), his failure to specifically mention the GAF score assigned by the Northeastern Center also does not serve as a basis for a remand. *See Denton*, 596 F.3d at 425 ("Rather than rely on the unexplained numerical score assigned by [the physician], the ALJ's ultimate finding of no disability was substantially supported by [the physician's] narrative finding that [the claimant] had no significant mental impairments."); *Boone v. Astrue*, No. 1:09-cv-250, 2010 WL 2943637, at *7 (N.D. Ind. July 22, 2010) (affirming the ALJ's decision where the ALJ considered the claimant's entire medical history but did not specifically mention the GAF scores in her decision); *Johnston v. Astrue*, No. 1:09-cv-3, 2009 WL 5175211, at *9 (N.D. Ind. Dec. 22, 2009) (affirming the ALJ's decision where he did not specifically mention the GAF score but it was clear that he had considered the medical source opinion); *Mobley-Butcher v. Astrue*, No. 1:06-cv-934, 2007 WL 3124478, at *11 (S.D. Ind. Sept. 6, 2007) (affirming the ALJ's decision and concluding that the ALJ "did not omit significant pieces of information necessary to understand the entire medical picture" where he did not specifically mention the claimant's GAF scores).

day; and his brother testified that Warner can pay attention for a long time, follows instructions well, gets along with authority figures, and can handle changes in routine. (Tr. 15-16); *see* 20 C.F.R. § 416.945 (instructing the ALJ to consider all of the relevant evidence in the case record when assessing a claimant's RFC)*; see also Gardner v. Barnhart*, No. 02 C 4578, 2004 WL 1470244, at *13 (N.D. Ill. June 29, 2004) (considering a claimant's limitations in activities of daily living when assigning her RFC); SSR 96-8p ("The RFC assessment must be based on all of the relevant evidence in the case record, such as . . . [r]eports of daily activities").

Perhaps most significantly, the ALJ emphasized that despite Warner's learning disorder and borderline intellectual functioning, he is a high school graduate and has a history of functioning in the workforce above the level of substantial gainful activity. (Tr. 18.)  In that regard, the ALJ found that Warner's past work as a janitor and dishwasher reflected an ability to perform unskilled work despite his learning disorder and borderline intelligence. (Tr. 18, 119); *see Whetzel v. Astrue*, No. 1:07-cv-210, 2009 WL 537640, at *21 (N.D. Ind. Mar. 4, 2009) ("Limitations in concentration, persistence, or pace are best observed in work settings . . . . (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1)).

At bottom, "an ALJ is free to formulate his mental residual functional capacity assessment in terms such as 'able to perform simple, routine, repetitive work' so long as the record adequately supports that conclusion." *Kusilek v. Barnhart*, No. 04-C-310-C, 2005 WL 567816, at *4 (W.D. Wis. Mar. 2, 2005); *see Johansen*, 314 F.3d at 289 ("All that is required is that the hypothetical question [to the VE] be supported by the medical evidence in the record." (quoting *Meredith v. Bowen*, 833 F.2d 650, 654 (7th Cir. 1987))).  In this particular instance, the record amply reflects that Warner has to the capacity to perform the mental activities identified

by the SSA for "unskilled work." *See, e.g.*, *Orucevic v. Astrue*, No. C07-1981 CRD, 2008 WL 4621420, at *7 (W.D. Wash. Oct. 16, 2008) (affirming the ALJ's decision limiting the claimant to "unskilled" work where the record indicated she could perform "simple, repetitive tasks," observing that the SSA's definition of "unskilled" work "describes repetitive tasks as the primary work duty"); *Karger v. Astrue*, 566 F. Supp. 2d 897, 909 (W.D. Wis. 2008) (affirming ALJ's decision where the record indicated that the claimant had the prerequisite mental abilities necessary to perform "unskilled" work). Therefore, Warner's first argument in pursuit of remand is unsuccessful.

### D. The ALJ's Step Four Finding Is Supported by Substantial Evidence

Warner also advances a rather cursory argument that the ALJ's step four conclusion that he could perform his past work as a janitor is not supported by substantial evidence. This argument is easily disposed of.

Warner contends that the ALJ erred because he never asked the VE whether the requirements of his past relevant work, either as he performed it or as it is performed in the economy, exceed the assigned RFC. Indeed, the ALJ did mistakenly state in his decision that the VE testified at the hearing that the requirements of Warner's past janitorial work would not exceed the RFC. This misstatement by the ALJ, however, is harmless because the VE testified that Warner's past job as a janitor was "unskilled, medium" work, and the RFC assigned by the ALJ contains *no* other limitations. (Tr. 43); *see Shramek v. Apfel*, 226 F.3d 809, 814 (7th Cir. 2000) (articulating that an error is harmless where it has no impact on the outcome). Consequently, Warner's nitpicking of the ALJ's decision in this respect is futile. *See Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) (explaining that when reviewing the ALJ's decision,

the court will "give the opinion a commonsensical reading rather than nitpicking at it").

Warner then reiterates his assertion that a limitation to "unskilled work" does not adequately account for moderate limitations in concentration, persistence, or pace. However, for the reasons articulated *supra*, in this particular instance an RFC for unskilled work is adequately supported by the record. Therefore, Warner's cursory argument challenging the ALJ's step-four finding does not warrant a remand of the Commissioner's final decision.

### E. The ALJ's Credibility Determination Will Not Be Disturbed

Finally, Warner makes a two-sentence challenge to the ALJ's credibility determination, contending that the ALJ was "mistaken in finding that his testimony indicated no additional limitations as his testimony on concentration according to the VE would indicate an inability to work." (Opening Br. 10.) But the Seventh Circuit "repeatedly ha[s] made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived . . . ." *United States v. Lanzotti*, 205 F.3d 951, 957 (7th Cir. 2000). Accordingly, because Warner's challenge to the ALJ's credibility is perfunctory and without support, it is deemed waived.

And even if it were not waived, the ALJ's credibility determination is adequately supported by the evidence of record, and Warner's cursory argument "amounts to nothing more than a dislike of the ALJ's phraseology," *Rice*, 384 F.3d at 371. Although Warner asserted at the hearing that his concentration difficulties affect his ability to work (Tr. 38), he could not provide an example of a time when he had a problem with concentration, instead vaguely responding that he just gets "confused sometimes" (Tr. 40).

As stated earlier, the ALJ considered Warner's assertion of concentration difficulties, but

astutely noted that on a daily basis he performs a full schedule of activities without difficulty—including shopping, several hours of housework, three hours of yard work, and two-hour walks. (Tr. 14-16); *see Schmidt*, 395 F.3d at 746-47 (considering claimant's performance of daily activities as a factor when discounting claimant's credibility); 20 C.F.R. § 416.929(c)(3); SSR 96-7p. The ALJ also noted that Warner had not received treatment for his mental impairment after his application date in 2008 other than medications, which cause him no side effects (Tr. 14, 35), and that he has no problems spending time with others. (Tr. 14-15); *see Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009) (explaining that the SSA "regulations expressly permit the ALJ to consider a claimant's treatment history"); *Ellis v. Astrue*, No. 2:09-cv-145, 2010 WL 3782265, at *20 (N.D. Ind. Sept. 30, 2010) (affirming the ALJ's discounting of claimant's complaints given the discrepancies between her self-reported symptoms and the lack of treatment for the purported condition); 20 C.F.R. § 416.929(c)(3); SSR 96-7p. In addition, the ALJ observed that Warner graduated from high school and has a significant work history in unskilled work despite his learning disorder and borderline intelligence, which, of course, are longstanding impairments. (Tr. 16, 18); *see Simila*, 573 F.3d at 519 (considering claimant's work history when discounting his credibility).

In short, the ALJ built an accurate and logical bridge between the evidence and his credibility determination, and his determination is not "patently wrong." *Shramek*, 226 F.3d at 811; *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). Therefore, the ALJ's credibility determination, which is entitled to special deference, *Powers*, 207 F.3d at 435, will not be disturbed.

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED.  The Clerk is directed to enter a judgment in favor of the Commissioner and against Warner.

SO ORDERED.

Enter for this 25th day of July, 2012.

S/Roger B. Cosbey<br>
Roger B. Cosbey,<br>
United States Magistrate Judge